## Walker's Estate. No. 1

*John M. Reed*, for administratrix.
*John W. Cost*, for minor.

Cox, J., March 28, 1946.—Zada Miller Walker, administratrix of the estate of Cecil James Walker, deceased, petitioned this court to distribute the sum of $18,000 realized from the settlement, without suit, of a claim arising from the death of decedent, against Pennsylvania Railroad Company, under the provisions of the Employers' Liability Act.

The settlement of this claim was made by petitioner, the personal representative of decedent, without the approval of this court. The amount of the settlement is not controverted, and on the basis of the facts surrounding the death of decedent we will not question its adequacy, but will confine ourselves in this opinion to the problem of its distribution.

The Employers' Liability Act of April 22, 1908, 35 Stat. at L. 65, as amended by the Act of August 11, 1939, 53 Stat. at L. 1404, provides, inter alia: "Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her

personal representative, for the benefit of the surviving widow or husband and children of such employee: . . ."

The persons entitled to the fund are Zada Miller Walker, petitioner and widow of decedent, and Audrey Maycelle Walker, daughter of decedent by a prior marriage of decedent with Margaret Held Walker.

Decedent and Margaret Held Walker were divorced in February 1939. The child, Audrey Maycelle Walker, was born on August 11, 1935, and at the time of death of decedent was nine years and 10 months old. The child has lived with her mother since the divorce.

Decedent and Zada Miller Walker were married on August 20, 1943. Zada Miller Walker was born on September 15, 1917, and at the time of death of decedent was 27 years and nine months old. She had been married to decedent 22 months. Decedent was born September 10, 1910, and died on January 6, 1945. He was 34 years and nine months old at the time of his death.

Decedent was employed as a fireman by the Pennsylvania Railroad Company, and was killed during the course of his employment in interstate commerce. The average monthly income of decedent at the time of his death was $265.

Zada Miller Walker was appointed administratrix of the estate of Cecil James Walker by the register of wills of this county July 25, 1945. The Potter Title & Trust Company of Pittsburgh, Pennsylvania, was appointed guardian of the estate of Audrey Maycelle Walker by this court on June 27, 1945.

The aforesaid petition having been presented to this court, a day was fixed for hearing at a time convenient to counsel, who were requested to present to the court the facts surrounding the death of decedent and information relative to the status of Zada Miller

Walker and Audrey Maycelle Walker, which would enable the court to make distribution of the fund. Counsel for Zada Miller Walker was particularly requested to have her present if possible. Zada Miller Walker did not appear at the hearing, her counsel stating that shortly after the settlement she had gone out of the State to the home of her mother, who was ill, and that he did not know when she would return to Pittsburgh or if she intended to return. Mr. Reed, counsel for Zada Miller Walker, is relying for the determination of the facts relative to the status of his client on the record data set forth in the petition and presented at the hearing.

It is to be noted that the Employers' Liability Act is silent as to the manner in which distribution is to be made by the personal representative of decedent to the persons entitled to share in the fund. Furthermore, the act does not define the phrase "for the benefit of the surviving widow . . . and children of such employee".

The acts of our State legislature covering the settlement of cases under the wrongful death acts and survival acts and specifying the method of distribution of funds resulting from an application of the acts cannot be applied to the instant case. In Michigan Central Railroad Co. v. Vreeland, 227 U. S. 59, the constitutionality of the law was attacked. The court said:

"By this act Congress has undertaken to cover the subject of the liability of railroad companies to their employes injured while engaged in interstate commerce. This exertion of a power which is granted in express terms must supersede all legislation over the same subject by the States."

We have searched with care, but have found no cases in the lower or appellate courts of Pennsylvania in which the problem of distribution of funds

realized from a settlement of a claim under the Employers' Liability Act has been considered. The problem has been considered by the United States courts and courts of other jurisdictions. We have studied these cases carefully and have applied the law as therein expounded to the factual situation in the instant case.

In the case before the court the settlement was arrived at without the consent of this court. In arriving at the amount of total settlement, it is presumed that the measure of damages was applied as determined by the principles established by the decisions in prior cases. The following cases illustrate these principles.

In Michigan Central Railroad Co. v. Vreeland, supra, the court, after stating that it was accepted that the measure of damages is based upon the pecuniary loss, said:

"The pecuniary loss is not dependent upon any legal liability of the injured person to the beneficiary. That is not the sole test. There must, however, appear some reasonable expectation of pecuniary assistance or support of which they have been deprived."

Further, at page 71, the court said:

"The word (pecuniary loss) as judicially adopted is not so narrow as to exclude damages for the loss of services of the husband, wife, or child when the beneficiary is a child, for the loss of that care, counsel, training and education which it might, under the evidence, have reasonably received from the parent, and which can only be supplied by the service of another for compensation. . . . No hard and fast rule by which pecuniary damages may in all cases be measured is possible." See, also, Cromley v. Speich, 19 F. Supp. 857.

In Philadelphia and R. Ry. Co. v. Marland, 239 Fed. 1 (1917), the court said,

". . . that in actions under this act (Employers' Liability Act) the measure of damages is the pecuniary loss resulting from death and sustained by the designated beneficiaries. This is usually limited to loss of support. . . ."

In Gulf, C. and S. F. R. Co. v. McGinnis, 228 U. S. 173, the court said:

"The statutory action of an administrator is not for the equal benefit of each of the surviving relatives for whose benefit the suit is brought. Though the judgment may be for a gross amount, the interest of each beneficiary must be measured by his or her individual pecuniary loss".

There are situations when a child over 21 years would be entitled to damages if he had in fact suffered a pecuniary loss, such as unemployed and living at home; sick or crippled, and receiving support, etc.

In Philadelphia and R. Ry. Co. v. Briscoe, 279 Fed. 680, the court said:

"The plaintiff was entitled to recover such an amount . . . as would fairly and reasonably compensate her and her children for the loss of pecuniary benefits which they might reasonably expect to have received but for Briscoe's death."

In developing the fact situation in this case, we find that an award was made for $15,000 for the benefit of the widow and three minor children, six, 10, and 12 years, respectively. The jury apportioned $3,000 to the widow and $4,000 to each of the three minor children. There is nothing in the record to show the age of the widow.

In some jurisdictions, distribution is made of the amount realized in the settlement by correlating the life expectancy of decedent and the beneficiaries with the pecuniary loss of each suffered by the death of decedent, and pro-rating the settlement fund. See

Tumolo v. Reading Co., 52 F. Supp. 956, for an apportionment based on this formula. This method in some instances would be fair, but in other instances unjust. We have not applied it in the case before the court.

It is our considered opinion that the ascertainment of pecuniary loss must be determined by the facts of each particular case. Congress has not fixed arbitrary standards for the ascertainment of pecuniary loss, but has left that determination to the courts, recognizing that from the decisions of the courts will come certain fixed principles which are sufficiently elastic to permit each case to be considered on its own facts, and permit distribution to be made in accordance with the pecuniary loss found by the court to be suffered by the persons entitled to be compensated.

Distribution of the funds realized from a settlement ordinarily are to be made on the same basis as the total pecuniary loss was determined at the time of settlement. In this case, however, the determination of the pecuniary loss of the child was incorrectly ascertained and we will not be bound by the actions of counsel.

The complete facts on which administratrix relied to arrive at a total settlement figure of $18,000 are not known by us. From the petition, from conferences with counsel and the guardian of the child, and from the testimony at the hearing, we do know that prior to settlement counsel for the guardian and counsel for administratrix did agree that the total figure should be $18,000, of which sum $3,500 should be allocated to the guardian for the child. Joseph L. Wilson, trust officer of the Potter Title & Trust Company, testified at the hearing as follows: "Q. Will you tell the court what those conferences concerned?

A. With reference to the settlement? Q. Yes. A.
Mr. Cost and Mr. Reed came to my office and told me
that there were plans for making a settlement of the
claim against the railroad company by reason of the
child's father's death, and I was requested by both
to execute a receipt and release for the child's share
of the settlement; the settlement was to be for $18,000,
of which the child's share was to be $3,500. I re-
fused to sign any receipt and release and there was
discussion as to the value of the child's share. As I
recollect, we studied the law a little bit and I was
informed by counsel, at least, that he understood it
was to be determined under the Federal Employers'
Liability Act and on the basis of the child's depend-
ency on her father's earnings, and it was considered,
that the recovery against the railroad company
would be limited by the dependency of the child; and
that only. The child's father had failed to contribute
to the child's support for many years prior to his
death, and that, therefore, there had been an order
of county court, desertion and nonsupport court, for
five dollars a week for the child's support, but
even that had not been paid by the father, and that
based on that record the recovery against the railroad
company could probably not exceed $3,500, which was
calculated at the rate of five dollars a week for some
11 years, the period of the child's minority".

Subsequent to this testimony Mr. Wilson testified
he had refused to execute a release for the child's
share unless court approval was first obtained. As
a result of his attitude, the petition for distribution
was presented to this court.

Mr. Wilson further testified on interrogation by
the court as follows: "Q. You have testified that you
had a conference with Mr. Reed relative to this set-
tlement? A. That is correct. Q. You were informed
by Mr. Reed that the total amount of the settlement

was to be $18,000? A. Yes, sir. Q. At this conference was Mr. Reed, Major Cost, and yourself? A. Yes, sir. Q. Was there anyone else present? A. No. Q. What was said at that time as to the amount of the total settlement which was to be allocated to the child, of which you are the guardian. A. We were to receive $3,500; $2,500 of that was to be for the child, and Major Cost was to receive $1,000 as attorney's fees for handling the case. Q. Did you as corporate representative of the guardian agree to this settlement? A. I did not agree to it. Q. Did you agree to the total settlement of $18,000? A. No, I did not agree to that; I understood that we were to be given authority by some court before we would agree to that amount. Q. As guardian you made no agreement with Mr. Reed or with the Pennsylvania Railroad Company, employer of the decedent, that this case would be settled and compromised for $18,000? A. That is correct, but I should qualify that, I believe, in fairness to Mr. Reed, that we discussed the possible recovery and I felt that the recovery was reasonable as far as I could see, but I insisted some court pass on it before we would give our unconditional approval".

It is significant that, although Mr. Wilson thought the total settlement figure reasonable, he would not officially give his consent, nor would he execute a release for the child on his own responsibility. It was his insistence that brought this matter before the court.

This court is not bound by any agreement between Counsel for administratrix and counsel for the guardian relative to the distribution of this fund. Applying the principles set forth in the cases we have heretofore cited, that the fund for distribution is to be distributed to the wife and child according to their pecuniary loss, we cannot agree that the distribution

of the fund in the amounts urged by counsel is proper, just, or fair.

The testimony discloses that the share to go to the child, $3,500, was ascertained by fixing the financial responsibility of the father at $5 a week for the number of weeks which would accrue until the child became 21. This weekly amount was based on the fact that in 1939 the County Court of Allegheny County, Pa., had ordered the father to pay $5 a week for the support of the child, and that the father had only paid $15 in the entire period between the time the order was made and his death, the arrearages at that time being $1,435. Counsel has taken this weekly figure as the legal liability of the father for the support of the child and the limit of the pecuniary loss of the child. Furthermore, counsel considered the fact that the father had not supported the child since 1939 as a negative factor militating against the child's claim for pecuniary loss.

Counsel misconceived the liability of the father and the basis for determining the pecuniary loss of the child. The court order for support of the child was made at a time when the father was unemployed. If application had been made when the circumstances changed, a greater allowance would have been given to the child.

The father's work record was bad, and he was completely indifferent to the welfare of his child. Six times during 1940 hearings were scheduled in the county court to compel him to pay the accumulated arrearages, but in each instance the father did not appear. Numerous attempts were made to serve him with process to compel his appearance, but he successfully avoided service. Finally, the mother gave up in disgust. In 1944, the father gave the child $10 and bought her a coat. That was the extent of his generosity.

The mother went to work three weeks after the birth of the child and has worked continuously since then. Her wage is $28 a week. On this modest income she has supported her child, her mother, her invalid father, and herself. The child is an intelligent, well-mannered, healthy girl and proves the quality of her mother, who has fulfilled her obligation, as well as her husband's in the care of the child. The father owed a duty to this child. He neglected his duty in his lifetime, but that fact certainly cannot, by any principle of the law with which we are familiar, work an estoppel and free the fund realized by his death from his liability.

In determining the pecuniary loss of this child we are not bound by an order of court made under entirely different circumstances than existed at the time of the death of the father; nor are we bound by the fact that during his lifetime he recognized no financial or moral obligation to his child, and, therefore, gave her neither money, parental affection, moral training, nor care.

We will award to the Potter Title & Trust Company, guardian of the estate of Audrey Maycelle Walker, the sum of $7,370. In arriving at this figure we have taken into consideration the length of expectancy of financial support by the father had he lived, which is 11 years and two months, or until the child is 21 years of age, and the income of the father at the time of death, which averaged $265 a month, together with all the attendant circumstances surrounding the relationship of the father and the child, which under the law set forth in the decided cases are considered as proper elements in determining pecuniary loss.

In arriving at this total sum we have carefully considered the amount which could have been allowed by

the court for the support of the child during the lifetime of the father. The court would have been justified in an award of $75 a month. By analogy, the sum of $7,370 would be $55 per month for a period of 11 years and two months, which we deem very reasonable.

The widow of decedent at the time he was killed was 27 years old and had been married to him only 22 months. Her health is good. She is a nurse and was employed both before and during her marriage. The widow has suffered a pecuniary loss because of the death of her husband. In determining the extent of that loss we have considered the factors of health, age, the comparative life expectancy of herself and husband, and her professional training, which increases her potential earning power. The position of women in a world engulfed in a social revolution is rapidly changing. She is no longer restrained by society in a cloistered existence, circumscribed by a tradition which prevents the full use of her intelligence or the realization of her vocational ambitions. We will award to her the sum of $10,124.50. Included in this amount is the cost of burial of decedent.

John M. Reed, counsel for administratrix, has charged a fee of $500 for his services. This fee is modest and fair and will be awarded to him, together with costs of $5.50 which he has incurred.

John W. Cost, counsel for the guardian, entered into an agreement with the mother of the child, Margaret Held Walker, divorced wife of decedent, for a contingent fee of $875, based on the total amount recovered for the child. This agreement is not binding on the child. The fee of Mr. Cost will not be considered at this time, he having presented his petition to the court to fix his fee. The fee will be later determined by the court and paid out of the

money decreed to the guardian of the child in this distribution.

In the distribution of this fund we have fully considered the comparative pecuniary loss suffered by the wife and the child as measured by the circumstances surrounding each.

## Decree

And now, to wit, March 28, 1946, this matter came on upon petition of Zada Miller Walker, administratrix of the estate of Cecil James Walker, deceased, praying the court to direct distribution of the sum of $18,000 received in settlement by the petitioner from the Pennsylvania Railroad Company under the provisions of the Employers' Liability Act on account of death of decedent, and testimony taken, and, upon consideration thereof, and for the reasons set forth in the foregoing opinion, it is ordered, adjudged, and decreed that the funds in the hands of the petitioner, to wit, $18,000, be paid in accordance with the schedule of distribution hereto attached and made part hereof, unless exceptions are filed within ten days.

### Schedule of Distribution

| | |
|---|---|
| Amount in hands of petitioner | $18,000.00 |
| Amount for distribution | 18,000.00 |
| To John M. Reed, attorney's fee and costs | $ 505.50 |
| " Zada Miller Walker, widow | 10,124.50 |
| " Potter Title & Trust Company, guardian of Estate of Audrey Maycelle Walker, a minor | 7,370.00 |
| | $18,000.00 |